DICKY HUEY and NEETA HUEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Huey v. Commissioner
Docket No. 26594-83.
United States Tax Court
T.C. Memo 1985-348; 1985 Tax Ct. Memo LEXIS 294; 50 T.C.M. (CCH) 430; T.C.M. (RIA) 85348; July 15, 1985. Daniel R. Rutherford, for the petitioners. Douglas R. Fortney, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined *295 a deficiency in the amount of $19,261 in petitioners' Federal income tax for 1979 together with an addition to tax under section 6653(a) [1] in the amount of $963.05. The issue for decision is whether petitioners' investment of $39,800 in San Antonio Basketball, Ltd., a limited partnership, is deductible for 1979 as a theft loss under section 165(a) and (c)(3). At the trial, respondent conceded that the section 6653(a) addition to tax is not applicable. FINDINGS OF FACT At the time they filed their petition, petitioners were legal residents of San Antonio, Texas.They filed their joint Federal income tax return and an amended joint income tax return for 1979 with the Internal Revenue Service Center, Austin, Texas. The issue here presented arises from the activities of petitioner Dicky Huey, and he will be referred to herein as petitioner. In the early 1970's, a group of individuals in San Antonio decided to bring a professional basketball team to the City. These individuals worked out an arrangement with the owners of a team in Dallas whereby they "rented" the team *296 for one year with an option to buy it. The individuals made this arrangement through a limited partnership, Professional Sports, Limited. The general partner in the partnership was a corporation named Professional Sports, Incorporated. Sometime in 1975, the San Antonio group decided to buy the team then known as the San Antonio Spurs, and a new limited partnership, San Antonio Basketball, Limited (SABL), was formed to handle the acquisition. The general partner in this partnership was Concessions, Inc., which had a lease on the San Antonio Arena, where the Spurs played their home games, and had a contract for concessions from the City of San Antonio. The limited partners owned an approximate 85-percent interest in SABL. Sometime in 1976, a decision was made to recapitalize the Spurs entities and to form a new limited partnership. Capital was needed to make the National Basketball Association franchise payment and to cover the team's operating expenses. The new partnership was named Spurs Professional Basketball Club, Limited (SPBCL), and Concessions, Inc. was the general partner. On or about January 20, 1976, petitioner committed himself to pay $30,000 for 10 units at $3,000 *297 per unit in SABL. On March 18, 1977, he committed himself to buy 10 units at $5,000 per unit for a total additional commitment of $50,000. In committing himself to the March 18, 1977, subscription, petitioner thought, after reading a prospectus and other related papers, that he was investing in SPBCL, the limited partnership that then owned the Spurs franchise. The following table shows the total amount of petitioner's commitment, the payments thereon, and how the payments were applied: Total
Payment
Balance
Date
Commitment
Amount
Principal
Interest
Due
1/20/76
$30,000
$5,000.00
$5,000
$25,000
9/22/76
30,000
1,406.76
$1,406.76
25,000
3/18/77
80,000
8,000.00
8,000
67,000
12/19/77
80,000
19,903.92
13,400
6,503.92
53,600
12/18/78
80,000
18,469.36
13,400
5,069.36
40,200
2/12/80
80,000
17,520.00
13,400
4,120.00
26,800
Petitioner paid the February 2, 1980, installment of $17,520 in order to prevent foreclosure of his interest. Sometime in about 1979, the management of the Spurs decided to invest in a "ticketmaster" venture and announced that the owners would be required to invest additional sums. The *298 interest of any owner who did not put up his percentage share of the needed additional funds would be diluted. Petitioner did not wish to invest any more money in the Spurs entities; he also did not wish to have his interest diluted. Sometime later in 1979, petitioner consulted an attorney who investigated petitioner's dealings with the Spurs entities. Based on an investigation and a study of the relevant papers, the attorney advised petitioner that all of his funds had been invested in SABL, which was a limited partner in SPBCL, and, therefore, that petitioner himself was not a limited partner in SPBCL, the organization that owned the Spurs franchise. The attorney also advised petitioner that, because his money had gone to SABL rather than to SPBCL, his indirect interest as a limited partner in the franchise had been decreased from what petitioner thought was 14 percent to .0785 of 1 percent. When the ticket-master venture went through and petitioner failed to provide the additional funds, his indirect interest in the franchise dropped further to .00175 of 1 percent. In the light of his investigation and certain representations contained in prospectuses issued by the Spurs *299 entities, the attorney advised petitioner that he had been defrauded and that his investment was worthless. The attorney also advised petitioner to take an ordinary deduction on his 1979 income tax return for the amount of his Spurs investment. In addition, the attorney advised petitioner that he should, if necessary, file suit against the Spurs entities. On January 25, 1980, petitioner made a demand on the Spurs entities for a return of his capital contributions to SABL pursuant to Tex. Civ. Stat. Ann. art. 6132a, sec. 17(b)(3) (Vernon 1981).After waiting for a statutory 6-month period, petitioner and another investor, James W. Simmons, filed suit against the Spurs entities and certain individuals. The suit was captioned Dicky Huey and James W. Simmmons v. San AntonioBasketball, Ltd., et al., in the District Court, 131st Judicial District, Bexar County, Texas, No. 80C1-18732. Petitioner paid all litigation expenses, and the attorney handled the case for a contingent fee. Petitioner and his attorney prosecuted the case vigorously. The attorney pursued mandamus proceedings in both the Texas Court of Civil Appeals and the Texas Supreme Court in order to compel the local *300 court to bring the case to trial. The defendants filed a motion for summary judgment, and the court granted the motion with respect to all allegations except one charging fraud. When petitioner's case, severed from that of James W. Simmons for trial, was finally tried, the jury rendered a verdict for him in the amount of approximately $315,000. In early 1985, the case was settled while pending on appeal for a sum in excess of the $39,800 claimed by petitioner as an income tax deduction for 1979. On their amended income tax return for 1979, filed May 27, 1980, petitioners claimed an ordinary loss deduction of $39,800 with respect to his SABL investment. In the notice of deficiency, respondent disallowed the deduction. OPINION To support the claimed ordinary deduction of $39,800, petitioner relies primarily upon section 165(a) and (c)(3)[2] which allows as a deduction any loss from theft sustained during the taxable year. A loss is sustained within the meaning of section 165(a) in the year identifiable events establish a closed and completed transaction. Sec. 1.165-1(d)(1), Income Tax Regs. *301 Under section 165(e), a theft loss is treated as sustained during the taxable year in which the taxpayer discovers the loss. Petitioner contends that he discovered in 1979 that the Spurs entities and the individuals that controlled them had defrauded him of his $39,800 investment; that such fraud constitutes theft within the meaning of section 165(c)(3); and that he is, therefore, entitled to the claimed deduction. Respondent maintains that petitioner *302 is not entitled to the deduction because he was not the victim of theft within the meaning of Texas law and, if he was, petitioner had a reasonable prospect in 1979 of recovering all or part of his contribution to the Spurs entities. The term "theft" as used in section 165(c)(3), is not-- like "larceny," a technical word of art with a narrowly defined meaning, but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile. Edwards v. Bromberg,232 F.2d 107, 110 (5th Cir. 1956); Cramer v. Commissioner,55 T.C. 1125, 1133 (1971); Gerstell v. Commissioner,46 T.C. 161, 171-172 (1966). Essential elements of a theft are criminal intent and illegal acts under the law of the jurisdiction where the alleged theft occurred. Johnson v. United States,291 F.2d 908, 909 (8th Cir. 1961); see also, Farcasanu v. Commissioner,436 F.2d 146, 149 (D.C. Cir. 1970). *303 The record on the issue as to whether the Spurs entities or the individuals controlling them committed theft under Texas law is far from satisfactory. No doubt a theft loss deduction may be allowable where the taxpayer has suffered a loss as a result of a false representation which induced him to part with his money. Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion, 523 F.2d 1053 (5th Cir. 1975); Bellis v. Commissioner,61 T.C. 354, 357 (1973), affd. 540 F.2d 448 (9th Cir. 1976); Nichols v. Commissioner,43 T.C. 842, 884 (1965); Norton v. Commissioner,40 T.C. 500, 504-505 (1963), affd. 333 F.2d 1005 (9th Cir. 1964). Unfortunately, for petitioner, however, we have only the conclusory version of petitioner and that of his attorney concerning the nature of the representations made to induce petitioner to make his investments. None of the prospectuses and other documents on which petitioner testified he relied were introduced in evidence. Thus, we have had no opportunity to measure petitioner's version against the actual representations *304 that were made. There is no evidence, moreover, that the representations, whatever they may have been, were made "with the specific intent of obtaining, acquiring, or securing any property or valuable right from petitioner and with the specific intent of criminally appropriating" such property or right. Paine v. Commissioner,63 T.C. at 741-742 (1975). In fact, we have no way of knowing whether the representations were knowingly or otherwise false or whether petitioner simply misunderstood them. None of the books and records of the Spurs entities, the partnership agreements, subscription agreements, or certificates of interest in the partnerships were offered in evidence to establish the rights petitioner received. None of the books and records of the Spurs entities, which petitioner or his attorney alleges were altered to petitioner's detriment, were presented. We have only petitioner's testimony, cast in general terms, and that of his attorney as to what transpired in petitioner's dealings with the Spurs entities. Indeed, much of the attorney's testimony was hearsay. Petitioner's briefs do not identify what crime under Texas law the Spurs entities and individuals *305 controlling them are alleged to have committed other than a general statement that petitioner was defrauded. [3] Although petitioner's attorney testified that a jury verdict finding fraud was returned in the State court proceeding, we have no evidence as to the instructions to the jury, the nature of the verdict--whether a general verdict or on special issues--or the legal theory on which the case was tried. In view of the inadequacy of the evidence before us, we are compelled to hold that petitioner has failed to carry his burden of proving that he suffered a theft loss within the meaning of section 165(c)(3). Even if he was the victim of theft, however, petitioner has not shown that he did not have a reasonable prospect in 1979 of recouping his loss through litigation. Section 1.165-1(d)(2)(i), Income Tax Regs., provides: *306 If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. The same regulation provides the following guidance for determining whether there is a reasonable prospect of recovery: Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. * * * See Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). *307 [4]
At the end of 1979, [5] petitioner had invested the $39,800 which he here seeks to deduct. He would have us conclude that, as of the end of 1979, he had been defrauded, his investment had become worthless, and he had no reasonable prospect of recovering any part of it. Yet, on February 12, 1980, less than 6 weeks after the end of 1979, he invested another $17,520 in SABL. True, his explanation is that payment of this installment was essential to prevent foreclosure of a lien on his partnership interest. It is almost inconceivable, however, that he would have thrown so much good money after bad if his interest in the Spurs entities had in fact become *308 worthless and if he had no prospect of recovering anything on his theft claim. Cf. Estate of Campbell,T.C. Memo. 1964-53, affd. 343 F.2d 462 (2d Cir. 1965). Further, less than a month after the end of 1979, petitioner gave a 6-months demand notice for the return of the amount of his investment, as required by certain provisions of Texas law, and then brought suit against the Spurs entities in accordance with the legal advice he had received in 1979. To hold, as petitioner argues, that he had no real prospect of recovery when he filed the suit, would require an analysis of much the same evidence as we have found missing on the issue as to whether petitioner suffered a theft loss. His proof is as inadequate on the recovery issue as it is on the issue as *309 to whether a theft was committed. The fact that petitioner filed a lawsuit to recover the deducted amount, however, "gives rise to an inference" that he had a reasonable claim against the Spurs entities. Dawn v. Commissioner,675 F.2d 1077, 1078 (9th Cir. 1982); Scofield's Estate v. Commissioner,266 F.2d 154, 160 (6th Cir. 1959), affg. 25 T.C. 774 (1956) ("at least prima facie weight to the good faith determination of a taxpayer that recovery of a given loss is worth pursuing by litigation"). Although we recognize that some lawsuits may be spurious, speculative, or wholly without merit, neither petitioner nor his attorney handled this lawsuit in a cavalier manner. They prosecuted it vigorously, engaging in extensive pretrial activity and carrying mandamus proceedings to the Texas Court of Civil Appeals and the Texas Supreme Court. Petitioner committed himself to, and did, pay the litigation costs, and his attorney handled the case on a contingent fee basis. Although every trial lawyer likes to have his client think his victories were achieved against great odds, we do not think an attorney would expend such a significant amount *310 of time and energy pursuing a worthless, futile claim on a contingent fee basis. Petitioner has simply not convinced us that, when he claimed the deduction here in dispute, he did not have a reasonable prospect of recovery in his suit. Petitioner emphasizes testimony that, in instituting the suit, the attorney advised that they "were embarking upon a futile and hopeless course of action that was dictated by the attorneys (sic) opinion that federal tax law required such a pursuit to prove worthlessness." Petitioner argues that the views of his attorney should control the issue as to a reasonable prospect of recovery. In Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 812 (1974), affd. 521 F.2d 786 (4th Cir. 1975), however, the Court rejected such an argument as follows: Without citing any substantive authority in support of their position, they [petitioners] urge that we adopt a standard under which, in effect, taxpayers who are told by their attorneys that claims against others will probably be unsuccessful, will be allowed to take a loss deduction, on the basis of such advice alone, in the year in which such advice is given. For a taxpayer *311 in such a situation, according to petitioners, is acting under a reasonable subjective belief that his property has been irretrievably lost. To adopt such a standard, however, would require us to ignore Boehm v. Commissioner, * * * [326 U.S. 287 (1945)], a case in which the Supreme Court of the United States explicitly rejected any notion that a taxpayer's reasonable beliefs or attitude are, or should be, "sole" or even "controlling" criteria in determining the year in which a loss can be deducted. 326 U.S. at 292. The Supreme Court there went on to say: "a loss, to be deductible under section * * * [165(c)(3)], must have been sustained infact during the taxable year. Boehm v. Commissioner, 326 U.S. at 292. [6]
In summary, petitioner has failed to demonstrate *312 that he suffered a theft loss from his dealings with the Spurs entities. He has not shown that the Spurs entities transgressed any Texas criminal laws. In early 1980, shortly after the close of the year in which he maintains that he discovered the loss, he invested another $17,520 in the Spurs entities. In addition, in accordance with advice received in 1979, he instituted, and later diligently prosecuted to a successful conclusion, a lawsuit against the Spurs entities, obtaining a judgment and later a settlement in an amount in excess of the amount of his alleged loss. "The Supreme Court has many times dictated that losses under * * * [section 165] are to be allowed or disallowed in accord with practical or realistic considerations." Scofield's Estate v. Commissioner,266 F.2d at 160. [7] Petitioner's proof does not meet that standard. The practical and realistic facts existing at the end of 1979, as disclosed by the trial record, fail to show that petitioner had no reasonable prospect of recouping his loss. Accordingly, the claimed theft loss must be denied. *313 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * (e) THEFT LOSSES.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.↩
3. The Texas statutes on theft, larceny, swindling, and obtaining money under false pretenses are reviewed in Paine v. Commissioner,63 T.C. 736, 740-743 (1975), affd. without published opinion 523 F.2d 1053↩ (5th Cir. 1975).
4. This regulation denying a deduction where there is a reasonable prospect of recovery is not inconsistent with the provision of sec. 165(e) that a theft loss is sustained in the year the loss is discovered. Rainbow Inn, Inc. v. Commissioner,433 F.2d 640, 642-643 (3d Cir. 1970), agreeing with a Memorandum Opinion of this Court on this point but reversing on other grounds; Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795, 807-811 (1974), affd. 521 F.2d 786↩ (4th Cir. 1975).
5. The evaluation of petitioner's recovery prospects must be made as of the time the deduction was claimed; the test is foresight and not hindsight, Scofield's Estate v. Commissioner,266 F.2d 154, 163 (6th Cir. 1959), but the judgment subsequently obtained in the litigation planned in 1979 may be considered. Gale v. Commissioner,41 T.C. 269, 276↩ (1963).
6. Stout v. Commissioner, a Memorandum Opinion of this Court dated Nov. 2, 1949, affd. on another issue, 185 F.2d 854↩ (6th Cir. 1950), relied upon by petitioner, is distinguishable. There the taxpayer was advised by an attorney that he had no reasonable prospect of recovery through legal action; he accepted that advice and did not file suit.
7. The Supreme Court cases referred to are Alison v. United States,344 U.S. 167 (1952); Boehm v. Commissioner,326 U.S. 278 (1945); Lucas v. American Code,280 U.S. 445 (1930); United States v. White Dental Co.,274 U.S. 398↩ (1927).